UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| GRETCHEN PIANKA, | ) | |
| | ) | Docket No. _:26-cv-00___ |
| Plaintiff, | ) | |
| | ) | COMPLAINT AND DEMAND |
| v. | ) | FOR JURY TRIAL |
| | ) | |
| CENTRAL MAINE HEALTHCARE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Plaintiff Gretchen Pianka ("**Dr. Pianka**") brings this civil action against Central Maine Healthcare ("**CMHC**") to secure relief, legal and equitable, under federal and state law for CMHC's unlawful discrimination against her because of her sex and unlawful retaliatory discharge.

## INTRODUCTION

This action arises under Title VII of the Civil Rights Act of 1964 ("**Title VII**"), 42 U.S.C. § 2000e et seq., the Maine Human Rights Act ("**MHRA**"), 5 M.R.S. §§ 4551-4634, and the Maine Whistleblower Protection Act ("**MWPA**"), 26 M.R.S. §§ 831-840. CMHC discriminated against Dr. Pianka because of her sex and terminated her employment because she opposed unlawful discrimination against herself and against her patients, and because she reported workplace conditions that she reasonably believed jeopardized patient health and safety.

## PARTIES

1.     Plaintiff Dr. Gretchen Pianka is a resident of Brunswick, Maine and a citizen of the United States who was previously employed by CMHC as a pediatrician.

2.     Defendant Central Maine Healthcare is a Maine non-profit corporation engaged in providing healthcare. At all relevant times, CMHC was doing business in Lewiston, Maine.

3.      For the calendar years of 2020-2022, CMHC employed more than 500 employees in each of twenty or more calendar weeks.

4.      Since 2022, CMHC has continuously employed more than 500 employees in each of twenty of more calendar weeks.

5.      At all material times, CMHC employed Dr. Pianka within the meaning of Title VII, the MHRA, and the MWPA.

## JURISDICTION AND VENUE

6.      This Court has proper subject matter jurisdiction over Dr. Pianka's federal claims under 28 U.S.C. § 1331 (federal question) and supplemental jurisdiction over Dr. Pianka's state law claims under 28 U.S.C. § 1367.

7.      Venue is proper in the District of Maine under 28 U.S.C. § 1391(b) because CMHC is incorporated and does business in the State of Maine and the events giving rise to Dr. Pianka's claims occurred within the state of Maine.

8.      Dr. Pianka filed a timely charge of discrimination with the Maine Human Rights Commission ("**MHRC**") and the Equal Employment Opportunity Commission ("**EEOC**").

9.      The MHRC issued reasonable grounds findings on Dr. Pianka's sex discrimination and retaliation claims.

10.     The MHRC and the EEOC have each issued Dr. Pianka notice of her right to sue. Dr. Pianka has exhausted all administrative remedies.

## DEMAND FOR JURY TRIAL

11.     Under Fed. R. Civ. P. 38(b), Dr. Pianka demands a trial by jury on all issues triable by a jury.

## FACTS

12.     Dr. Pianka is a female medical doctor licensed to practice medicine in the State of Maine and she is Board Certified in pediatrics.

13.     Dr. Pianka has over twenty years of experience as a pediatrician.

14.     Dr. Pianka worked as a pediatrician for Central Maine Pediatrics ("**CM Peds**"), a sub-department of CMHC's Central Maine Medical Group, which is a department within CMHC.

15.     Dr. Pianka began working at CM Peds in Lewiston in or around June 2017.

16.     Pursuant to Dr. Pianka's employment contract with CMHC, CMHC could only terminate Dr. Pianka's employment for cause or with 120 days' notice.

17.     Dr. Pianka's work performance for CMHC was satisfactory or better throughout her employment.

18.     CMHC never gave Dr. Pianka any written warning.

19.     CMHC never disciplined Dr. Pianka.

20.     CMHC never placed Dr. Pianka on a Focused Professional Practice Evaluation ("**FPPE**") or any form of performance improvement plan.

21.     Dr. Pianka was well respected as a pediatrician at CMHC.

### Sex Discrimination

22.     In or around September 2020, Dr. David Baker, the then CM Peds Managing Physician, decided to voluntarily step down from his role as Managing Physician but continue to provide clinical care at CM Peds.

23.     Dr. Pianka told Dr. Baker she would be happy to take over for him as Managing Physician if and when he quit.

24.  In or around September 2020, CMHC promoted Dr. Pianka to the Managing Physician position.

25. In promoting Dr. Pianka, CMHC management made it clear they were reluctant to promote her into the position of Managing Physician, and they granted her diminished authority compared to the authority Dr. Baker, a man, possessed as Managing Physician.

26. In his September 11, 2020 email offering Dr. Pianka the Managing Physician position, Dr. Nathan Raby, CMHC's Region 1 Medical Director, wrote "despite some initial hesitancy from all of our prior experiences, the position of physician manager for the CM Peds office is yours if you want it."

27. Dr. Raby's offer email conditioned the offer on Dr. Pianka accepting certain "expectations" to which Dr. Baker was not subjected.

28. Dr. Raby offered Dr. Pianka the Managing Physician role on a six-month "trial" basis, another term to which Dr. Baker was not subjected.

29. Although Dr. Pianka performed her Managing Physician duties satisfactorily or better, CMHC never lifted the restrictions on Dr. Pianka's authority that it imposed during the supposed six-month trial period.

30. Throughout her time serving in the role as Managing Physician, CMHC treated her differently than Dr. Baker, even after she became oriented to the position.

31. Examples of the difference in treatment between Dr. Pianka and Dr. Baker include, without limitation:

    a. CMHC management required Dr. Pianka to report directly to Dr. Raby, Dr. Michael Stadnicki, CMHC's Chief of Primary Care, and Cindy Richards, CMHC's non-clinical Regional Director. Dr. Baker was never required to report directly to management, even when he was new to the role.

    b. Dr. Pianka was required to have weekly "Pediatric Leadership huddles" with Dr. Raby, Ms. Richards, and Dr. Stadnicki. Dr. Baker was allowed to set meetings with

management at his discretion and seek support from CMHC administration on an as-needed basis.

c.  CMHC directed Dr. Pianka to copy members of management on her email correspondence with CM Peds providers. Dr. Baker was not so required and could communicate freely with the CM Peds providers.

d.  CMHC management required Dr. Pianka to seek management's approval on decisions she made pursuant to her role as Managing Physician. Dr. Baker was not required to seek prior approval of his management decisions.

e.  CMHC management unilaterally cancelled Dr. Pianka's patient appointments when they decided they wanted to meet with her. Dr. Baker was afforded autonomy over his schedule and met with management at times that worked for him and did not interrupt patient care.

f.  CMHC management insisted on being present during the monthly meetings Dr. Pianka held with the CM Peds providers. Dr. Baker held provider meetings without management's presence.

g.  Except for one meeting for the Professional Health Committee (a committee that disbanded), CMHC never asked Dr. Pianka to serve on a committee or work on a project despite these duties being listed in her Managing Physician contract.

32.  During her employment at CMHC, members of management made sex-based comments about and to Dr. Pianka, including, but not limited to, the following:

a.  Cindy Richards, CMHC's non-clinical Regional Director, referred to Dr. Pianka as "overly emotional" based on Dr. Pianka's advocacy for patients during the COVID-19 pandemic;

    b.   Ms. Richards characterized Dr. Pianka's advocacy for patient care needs at CM Peds as excessive, saying Dr. Pianka was "spinning" and "obsessed";

    c.   Dr. Nathan Raby, CMHC's Region 1 Medical Director, told Dr. Pianka she was "like a Disney princess" and he was just looking forward to hearing her start swearing;

    d.   Dr. Michael Stadnicki, CMHC's Chief of Primary Care, publicly told Dr. Pianka she needed to "calm down and take a breath" when Dr. Pianka was advocating for equal access to acute care within the primary care setting, including nebulizer treatments for babies and children with disabilities.

33. Upon information and belief, Ms. Richards has never called a male provider "overly emotional" or characterized a male provider as "spinning" or "obsessed."

34. Upon information and belief, Dr. Raby has never commented to a male provider that he was "like a Disney princess" and that he was just looking forward to hearing them start swearing.

35. Upon information and belief, Dr. Stadnicki has never told a male provider to "calm down and take a breath" when they were advocating for patients; in fact, when a male provider made a passionate plea regarding the opioid crisis in Dr. Stadnicki's presence, Dr. Stadnicki did not tell him to "calm down and take a breath."

36. In or around May 2021, Dr. Pianka needed to implement a FPPE with one of the CM Peds female providers. Rather than allowing Dr. Pianka to lead the FPPE process, as delegated to her in her job description, Dr. Raby led the meeting with the provider and had Dr. Pianka take notes as if she were his secretary.

37. Despite the limits that Dr. Raby, Dr. Stadnicki, and Ms. Richards placed upon Dr. Pianka, she attempted to lead the CM Peds group and advocate for CM Peds providers and patients.

38.     CMHC management did not allow Dr. Pianka to fully exercise her authority as Managing Physician.

39.     Dr. Raby, Dr. Stadnicki, and Ms. Richards confused Dr. Pianka with another female pediatrician both leading up to and following Dr. Pianka's termination.

40.     For example, the other female pediatrician sent excessive and late-night emails to Dr. Pianka and CMHC administration without leaving time for adequate response; CMHC later ascribed this type of behavior to Dr. Pianka without a legitimate basis in an attempt to justify her termination.

41.     Dr. Pianka attempted to fulfill her duties as Managing Physician despite the restraints imposed upon her. However, she increasingly encountered obstacles to:

    a.  providing appropriate patient care, such as equal and safe access to nebulizer treatment and an on-call system with a nurse triage to avoid near clinical misses; and

    b.  meeting basic obligations to retain providers such as compensating them accurately and addressing concerns regarding safety of patient care and on-call duties.

42.     Dr. Pianka attempted to work with Ms. Richards, Dr. Raby, and Dr. Stadnicki on these and other issues, but they did not communicate with her about their efforts, if any, to address the problems and they did not appear to take her concerns seriously.

43.     CMHC placed Ms. Richards in a position over Dr. Pianka where Ms. Richards served as a primary go-between Dr. Pianka and senior level management, yet Ms. Richards has no clinical background and demonstrated a lack of understanding of many of the clinical issues Dr. Pianka raised.

44.     Over time, based on the different treatment she was receiving as compared to Dr. Baker in her ability to do her job as Managing Physician and based on the sex based comments Ms. Richards, Dr. Raby, and Dr. Stadnicki made about her, Dr. Pianka became reasonably concerned that

CMHC was denying her the ability to fully exercise her authority as Managing Physician because of her sex.

45.    On or about October 24, 2022, Dr. Pianka went to CMHC's Senior Human Resources Business Partner Darcie Frohlich for help. She reported that she was concerned she was being discriminated against because of her sex by CMHC and her concerns that the discrimination was compromising patient care.

46.    Ms. Frohlich did not take Dr. Pianka's concerns seriously. In her notes, she described Dr. Pianka as "tearful," "emotional," "scattered," "erratic" and "unfocused."

47.    Ms. Frohlich later told Dr. Stadnicki that, based on Dr. Pianka's emotional state while reporting sex discrimination, Ms. Frohlich was concerned for Dr. Pianka's mental well-being and questioned her fitness to continue working.

48.    Ms. Frolich asked Dr. Pianka to put her sex discrimination claims in writing, which Dr. Pianka did and submitted to Ms. Frolich on or about November 4, 2022.

49.    In her formal HR complaint, Dr. Pianka wrote that she believed CMHC was disregarding her safety concerns and not allowing her to perform her job as Managing Physician to the detriment of patient care and safety.

50.    CMHC ultimately terminated Dr. Pianka's employment based on her sex and/or sex-based stereotypes.

### *RETALIATION*

51.    At all relevant times, CM Peds was housed at CMHC's 12 High Street location.

52.    As Managing Physician, Dr. Pianka attempted to work with CMHC administration to try and meet the unique needs of sick pediatric patients during and after the pandemic, including addressing limitations caused by 12 High Street not being equipped with the negative pressure units needed to provide nebulizer treatments to all pediatric patients.

53.     CMHC's initial solution was to open a new pediatric respiratory clinic in the basement of a nearby building, 10 High Street, where administration authorized the installation of multiple negative pressure units.

54.     The rooms at 10 High Street provided space where children who could not safely be seen at 12 High (due to COVID Pandemic restrictions) could receive care in their primary care office. Specifically, this included babies and older children with certain disabilities preventing them from being able to wear a mask or use a filtered nebulizer device.

55.     Until around June 2022, the 10 High Street clinic was staffed daily with the same hours as 12 High.

56.     In or around June 2022, Ms. Richards and CM Peds's Practice Manager Paige Landry decided to slash the hours of operation to just one hour per day: 1:00 PM to 2:00 PM.

57.     Dr. Pianka told Ms. Richards and Drs. Raby and Stadnicki that limiting the hours at 10 High was an inadequate solution, that it discriminated against babies and children with certain disabilities, and that this problem would be compounded with the onset of the respiratory virus season in the fall.

58.     Cutting back 10 High hours meant that CM Peds had to send vulnerable patients to the emergency room or urgent care centers for basic treatment of asthma, ear infections, and other common maladies, resulting in delays in care and preventing access to care in CM Peds, the patients' "medical home."

59.     Medical homes allow for continuity of care, which is particularly important for children with disabilities who often have unique and complex medical needs.

60.     Care outside of the medical home increases the risk of inadequate care and poor outcomes for patients.

61.     CMHC was at that time enrolled in the State of Maine's Primary Care Plus ("PC-Plus") program, which meant that CMHC had committed to maintaining the medical home model (seeing patients within the medical home for well and acute care when at all possible) in exchange for enhanced reimbursement from the State of Maine.

62.     Upon information and belief, CMHC billed the State of Maine at PC-Plus enhanced rates during the times when it was refusing care to sick infants and disabled children in their medical home in violation of PC-Plus commitments.

63.     Dr. Pianka offered creative solutions and attempted to problem solve with CHMC administration to prevent patient harm and discrimination and to comply with the PC-Plus requirements.

64.     In her effort to understand the magnitude of the problem, Dr. Pianka got permission from Ms. Landry and Ms. Richards to have the nurses in the office who were triaging acute patient phone calls to use a tick and tally system to enumerate how many acute patients were being sent out of the medical home to the emergency room or to an urgent care clinic. However, when Dr. Pianka asked nurses for the data, nurses explained that Ms. Landry told them not to collect the information.

65.     Another major safety concern identified by Dr. Pianka arose when Dr. Stadnicki terminated CM Peds's long standing after-hours nurse triage service.

66.     Having an after-hours nurse triage service allowed anxious parents with sick children to immediately speak to a nurse. Without it, parents were only able to speak to a non-clinical note taker, who would then forward a message to the on-call provider.

67.     CMHC engaged American Health Connection, Inc. ("AHC") to replace the nurse triage system.

68.     AHC provided no nurse triage service; it took messages from callers and contacted the on call pediatric provider.

69.     AHC made errors, including wrong and missing phone numbers, missing patient information, and sending pages to the wrong provider.

70.     AHC admitted to making multiple errors.

71.     AHC's errors led to at least nine clinical near misses when Dr. Pianka was on call.

72.     A clinical "near miss" is a patient safety event that could have reached the patient and caused harm but did not due to chance, luck, or timely intervention.

73.     Near misses, which are caught before becoming full adverse events, represent an opportunity to fix system weaknesses before harm occurs.

74.     Other CM Peds pediatric providers informed Dr. Pianka of near misses when they were on call.

75.     In addition to patient safety issues, the AHC system also negatively impacted pediatric providers' quality-of-life and their desire to remain employed at CMHC.

76.     Pediatric providers were receiving almost triple the calls compared to their family medicine colleagues.

77.     After-hours nurse triage substantially reduces the number of calls that are put through to the on-call provider.

78.     Dr. Stadnicki (who is a family medicine provider, not a pediatrician) and Ms. Richards (who has no clinical training) dismissed the safety concerns and minimized the quality-of-life issues raised by Dr. Pianka on behalf of the pediatricians.

79.     Dr. Pianka advocated for the return of an affordable nurse triage system.

80.     Dr. Pianka provided CMHC administration with proformas in advance of budget cycle deadlines delineating upfront costs and revenue projections to reinstitute a nurse triage system.

81.     CMHC did not incorporate the nurse triage system into the budget, and then later dismissed the suggestion as "not being in the budget."

82.     Ms. Richards once explained to Dr. Pianka that "all the practices need something" and gave the example of how one of the other primary care practices needed new waiting room chairs. This failure to understand the difference between clinical and non-clinical needs led Dr. Pianka to believe that her information and requests were not making it to clinical decision makers.

83.     On or about August 4, 2022, during a one-on-one meeting between Ms. Richards and Dr. Pianka in which they were discussing recurring patient safety issues, Dr. Pianka asked Ms. Richards if she should file a specific patient safety concern as a MIDAS report.

84.     MIDAS refers to Medical Information Data Analysis System, which is a platform for hospitals and healthcare systems to electronically report and analyze patient safety events, quality metrics, and risk management data thereby helping to improve processes.

85.     Ms. Richards told Dr. Pianka that she should *not* file her concerns as MIDAS reports, particularly as those reports related to another provider, because it could be seen as retaliatory.

86.     On or about August 5, 2022, Dr. Pianka met with Ms. Frohlich who told Dr. Pianka she should file a MIDAS report regarding patient safety concerns even if it concerned another provider.

87.     This was the first MIDAS report Dr. Pianka had filed, never having been trained in when and how CMHC wanted her to utilize this system.

88.     Thereafter, Dr. Pianka filed multiple MIDAS reports detailing near misses, following the guidelines of the organization, including one about a suicidal teen patient in the spring of 2020 who nearly died due to Ms. Richards's administrative decision to cancel the teen's appointment without consulting with Dr. Pianka.

89.     On or about August 9, 2022, Dr. Pianka mentioned to Ms. Richards that she had filed the MIDAS reports per her discussion with Ms. Frohlich.

90.     Ms. Richards appeared annoyed that Dr. Pianka filed MIDAS reports, saying in an upset manner, "yes, I know, they all came through at once."

91.     On or about October 11, 2022, during a meeting in which Dr. Pianka was advocating for making respiratory care and nebulizer treatments available for all patients at CM Peds by installing negative pressure units at 12 High Street, Ms. Richards said, "but you're fine, you have 10 High."

92.     Ms. Richards clearly did not understand Dr. Pianka's concern that the one hour per day availability at 10 High was inadequate and led to a discriminatory care model and failed to maintain a medical home for all patients as required by PC-Plus.

93.     On or about October 18, 2022, Dr. Pianka met with Ms. Richards and the CM Peds Practice Manager to discuss operational plans to address looming staff shortages.

94.     During this meeting, Dr. Pianka suggested reinstating a nursing triage phone system due to low office staffing, pressure on on-call clinicians, and the increasing patient safety concerns.

95.     Ms. Richards told Dr. Pianka she relayed Dr. Pianka's concerns to senior management, but she refused to tell Dr. Pianka what she said or to otherwise provide Dr. Pianka with information about what, if anything, was going to be done.

96.     Ms. Richards, Dr. Raby, and Dr. Stadnicki did not include Dr. Pianka on an email chain (or chains) or otherwise communicate with Dr. Pianka regarding CMHC's plans to implement nebulizer treatments at 12 High Street, leaving Dr. Pianka with the impression that CMHC was not addressing the discriminatory care, access to respiratory care in the medical home, or the other issues.

97.     After months of trying to work with Dr. Raby, Ms. Richards, and Dr. Stadnicki to address these issues, on or about October 28, 2022, Dr. Pianka wrote a letter outlining her concerns to members of CMHC's senior leadership, including Dr. Jason Krupp, CMHC's then-Chief Physician Executive, and Dr. John Alexander, CMHC's Chief Medical and Operations Officer.

98.     Dr. Pianka's October 28, 2022, letter addressed the need for an after-hours nurse triage phone service, the need to eliminate errors in provider compensation, and the need for negative pressure units to provide a minimum standard of care for all patients at 12 High Street.

99.     Less than seventy-two (72) hours after Dr. Pianka sent her October 28, 2022, letter to senior leadership, CMHC enabled non-filtered nebulizer treatments to be administered at 12 High Street after a negative rapid COVID test.

100.     Providing nebulizer treatments for all pediatric patients at 12 High Street allowed babies and children with disabilities to be seen in their medical home for respiratory and acute concerns.

101.     This change at 12 High Street addressed one of Dr. Pianka's concerns and reinforced her reasonable belief that the details of her concerns were not making it through the layers of administration to decision makers.

102.     On or around November 8, 2022, Jennifer Flynn, a Nurse Practitioner at CM Peds, reported to Ms. Landry that a young child was left in a closed exam room, never having been seen by a provider after all clinical staff left for the day. When Dr. Pianka tried to review this near miss with Ms. Landry, she responded that it was not a problem because they "weren't in there for very long" and stated the event did not warrant a near miss report or any systemic change.

103.     Prior to November 10, 2022, Dr. Pianka attempted to obtain a full log of all the after-hours call errors from Joy Mahusky, Director of Operations at AHC. However, CMHC's System Director Diane Daigle intervened and took the log of errors at the instruction of Ms. Richards and told Ms. Mahusky to not release the information to Dr. Pianka.

104.     The log Dr. Pianka was seeking from AHC included potential near-misses or worse with newborns and severely ill children, which could have warranted further reporting based on

current guidelines (e.g., the Joint Commission on Accreditation of Healthcare Organizations) based on outcomes which Dr. Pianka was not allowed to review.

105.    Ms. Daigle and Ms. Richards are both non-clinical administrators who intervened with Dr. Pianka's attempt to obtain the information from AHC.

106.    No clinical team member such as Dr. Raby or Dr. Stadnicki asked Dr. Pianka what her concerns were regarding AHC even though she had previously shared a log of errors with them.

107.    In response to Dr. Pianka's October 28, 2022, letter to senior leadership, Dr. Krupp, Dr. Stadnicki, and Richard Kropp, CMHC's Chief People Officer, scheduled a meeting with the CM Peds practice group on or about November 14, 2022.

108.    Dr. Pianka was out of the state at the time so she requested the meeting be rescheduled so she could attend in person.

109.    Dr. Krupp denied her request to reschedule so Dr. Pianka attended the November 14, 2022, meeting remotely via videoconferencing.

110.    When Dr. Pianka asked Dr. Krupp what the meeting was about, he told her it was to discuss whether there was a future for CM Peds or whether to close the practice group entirely.

111.    Dr. Pianka had a colleague circulate to the in-person meeting attendees a two-page strategic plan Dr. Pianka formulated outlining her outstanding concerns and proposing next steps towards realistic options for resolution.

112.    During the November 14, 2022, meeting, Mr. Kropp and Dr. Krupp attempted to intimidate Dr. Pianka and made statements threatening to close CM Peds altogether if Dr. Pianka and others did not get in line. For example:

        a.    Mr. Kropp disclosed to the group that Dr. Pianka filed a sex discrimination report with HR and questioned her about it in front of everyone.

b.  Dr. Krupp referenced Dr. Pianka's reports that CMHC was discriminating against young and disabled patients by not having appropriate acute care resources, including nebulizers at 12 High Street, saying that if other providers felt the same way, they should shut down the practice because they had lost all faith.

c.  Dr. Krupp said he could not see a path forward for CM Peds when employees were saying there was a hostile work environment and they felt unsafe.

d.  Dr. Krupp further stated he treated all his managing physicians "fairly but not equally."

e.  Dr. Krupp referred to Dr. Pianka's strategic plan as "these nuclear options" that he could not tolerate.

f.  Dr. Krupp ended the meeting by asking the providers to tell him (verbally, not via email) if they wanted to stay with CMHC.

113.  Dr. Krupp and Mr. Kropp did not engage with Dr. Pianka or the CM Peds group about finding solutions to the concerns.

114.  The overall message of the meeting was that, if the CM Peds providers wanted to keep their jobs, they had to stop complaining.

115.  Following the November 14, 2022, meeting, Dr. Pianka timely indicated to Dr. Krupp that she wanted to continue working at CM Peds.

116.  On or about November 15, 2022, Ms. Frohlich concluded that CMHC had not discriminated against Dr. Pianka on the basis of her sex.

117.  Ms. Frolich further concluded that CMHC should fire Dr. Pianka due to her "excessive and continued emails" to senior leadership, Dr. Raby, Ms. Richards, and Dr. Stadnicki, which related to patient care and safety concerns.

118.    Ms. Frolich did not conduct an investigation into Dr. Pianka's sex discrimination complaint that met even the most basic HR standards.

119.    Ms. Frohlich never told Dr. Pianka that Dr. Pianka was under investigation.

120.    Ms. Frolich did not give Dr. Pianka any opportunity to respond to allegations against her leading to her termination.

121.    Ms. Frohlich never interviewed Dr. Pianka as part of her investigation into allegations against Dr. Pianka.

122.    Ms. Frohlich never interviewed any of the female CM Peds providers as part of her investigation of Dr. Pianka's complaint.

123.    Ms. Frohlich did interview Dr. Baker and he reported that Dr. Pianka received different treatment as Managing Physician than he did when he held that title, but Ms. Frohlich dismissed this evidence.

124.    Ms. Frohlich did not write an investigation report; rather, she grouped together various notes and emails, some of which pertained to concerns about a different female CM Peds provider's conduct, not Dr. Pianka's.

125.    Ms. Frolich failed to consider that CMHC's Code of Conduct required Dr. Pianka to report issues regarding patient care and safety and to escalate the matter to higher levels of management until Dr. Pianka was satisfied that the "full importance of the matter ha[d] been recognized."

126.    On or about November 22, 2022, Mr. Kropp called Dr. Pianka to a meeting after she was finished seeing patients for the day and handed her a letter stating that CMHC was exercising its right to terminate her employment contract "without cause." Although the termination was not related to any clinical concerns, CMHC refused to allow her to work during the 120 contractual notice period following the termination notice on November 22, 2022.

127.    CMHC had security escort Dr. Pianka out of the building as though she had done something wrong or was a threat. CMHC did not allow Dr. Pianka to go back to her desk and collect her belongings or finish her clinical notes for the day—Ms. Daigle handed Dr. Pianka paper "down time" forms and asked her to finish her notes manually and send them back to her.

128.    CMHC did not allow Dr. Pianka to communicate her departure to her patients or hand them off to another provider, giving patients the impression she had been fired for wrongdoing or that she abandoned them, and risking patient harm for those who required a warm hand off due to the acuity or complexity of their medical condition.

129.    Upon information and belief, many of Dr. Pianka's patients received a letter telling them they no longer had a medical home or pediatrician and "firing" them from the practice.

130.    Upon information and belief, CMHC has not sent any such letters to patients when other pediatric providers left CM Peds.

131.    As a result of CMHC's unlawful discrimination and retaliation against Dr. Pianka, she experienced lost wages, lost benefits, loss of enjoyment of life, loss of self-esteem, injury to reputation, injury to career, anxiety, humiliation, and other pecuniary and non-pecuniary losses.

132.    CMHC intentionally discriminated and retaliated against Dr. Pianka with malice or with reckless indifference to Dr. Pianka's statutorily protected rights.

## COUNT I
### Title VII—Discrimination on the Basis of Sex in violation of 42 U.S.C. § 2000e-2(a)(1)

133.    The allegations set forth in Paragraphs 1 through 132 are realleged and incorporated by reference.

134.    Dr. Pianka is a member of a protected class on the basis of sex; she is a woman.

135.    CMHC violated Title VII of the Federal Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. as described above by discriminating against Dr. Pianka because of her sex by treating her

differently than similarly situated male employees, including but not limited to providing her less favorable terms, conditions, and privileges of employment than those of CMHC's male employees, subjecting her to offensive sex-based stereotyping and conduct, and terminating her employment.

136.    As a direct and proximate result of these unlawful employment practices and in disregard of Dr. Pianka's rights, Dr. Pianka experienced lost wages, lost benefits, loss of enjoyment of life, loss of self-esteem, injury to reputation, injury to career, anxiety, humiliation, and other pecuniary and non-pecuniary losses.

137.    CMHC intentionally discriminated against Dr. Pianka with malice or with reckless indifference to Dr. Pianka's statutorily protected rights.

## COUNT II
### Title VII—Retaliation in violation of 42 U.S.C. § 2000e-3(a)

138.    The allegations set forth in Paragraphs 1 through 137 are realleged and incorporated by reference.

139.    Dr. Pianka opposed CMHC's unlawful sex discrimination when she reported to HR and senior leaders that she was being discriminated against because of her sex.

140.    Dr. Pianka suffered an adverse employment action when CMHC unlawfully terminated her employment because she opposed CMHC's discriminatory conduct.

141.     As a direct and proximate result of these unlawful employment practices and in disregard of Dr. Pianka's rights, Dr. Pianka experienced lost wages, lost benefits, loss of enjoyment of life, loss of self-esteem, injury to reputation, injury to career, anxiety, humiliation, and other pecuniary and non-pecuniary losses.

142.    CMHC intentionally retaliated against Dr. Pianka with malice or with reckless indifference to Dr. Pianka's statutorily protected rights.

## COUNT III
### MHRA—Discrimination on the Basis of Sex in violation of 5 M.R.S. § 4572(1)(A)

143.    The allegations set forth in Paragraphs 1 through 142 are realleged and incorporated by reference.

144.    Dr. Pianka is a member of a protected class on the basis of sex; she is a woman.

145.    CMHC violated the Maine Human Rights Act, 5 M.R.S. §§ 4551-4634, as described above by discriminating against Dr. Pianka because of her sex by treating her differently than similarly situated male employees, including but not limited to providing her less favorable terms, conditions, and privileges of employment than those of CMHC's male employees, subjecting her to offensive sex-based stereotyping and conduct, and terminating her employment.

146.    As a direct and proximate result of these unlawful employment practices and in disregard of Dr. Pianka's rights, Dr. Pianka experienced lost wages, lost benefits, loss of enjoyment of life, loss of self-esteem, injury to reputation, injury to career, anxiety, humiliation, and other pecuniary and non-pecuniary losses.

147.    CMHC intentionally discriminated against Dr. Pianka with malice or with reckless indifference to Dr. Pianka's statutorily protected rights.

## COUNT IV
### MHRA—Retaliation in violation of 5 M.R.S. § 4572(1)(E)

148.    The allegations set forth in Paragraphs 1 through 147 are realleged and incorporated by reference.

149.    Dr. Pianka opposed CMHC's unlawful sex discrimination when she reported to HR and senior leaders that she was being discriminated against because of her sex.

150.    Dr. Pianka suffered an adverse employment action when CMHC unlawfully terminated her employment because she opposed discriminatory conduct prohibited by the MHRA.

151.    As a direct and proximate result of these unlawful employment practices and in disregard of Dr. Pianka's rights, Dr. Pianka experienced lost wages, lost benefits, loss of enjoyment of

life, loss of self-esteem, injury to reputation, injury to career, anxiety, humiliation, and other pecuniary and non-pecuniary losses.

152.    CMHC intentionally retaliated against Dr. Pianka with malice or with reckless indifference to Dr. Pianka's statutorily protected rights.

## COUNT V

### MHRA – Retaliation in Violation of 5 M.R.S. § 4633

153.    The allegations set forth in Paragraphs 1 through 152 are realleged and incorporated by reference.

154.    Dr. Pianka opposed CMHC's unlawful discrimination in providing public accommodations on the basis of age and disability in violation of 5 M.R.S. §§ 4591-4592 when she reported discriminatory practices against CMHC's pediatric patients to senior leadership.

155.    CMHC retaliated against Dr. Pianka in violation of 5 M.R.S. § 4633(1) when it terminated her employment because she opposed CMHC's unlawful practices.

156.    As a direct and proximate result of this unlawful retaliation and in disregard of Dr. Pianka's rights, Dr. Pianka experienced lost wages, lost benefits, loss of enjoyment of life, loss of self-esteem, injury to reputation, injury to career, anxiety, humiliation, and other pecuniary and non-pecuniary losses.

157.    CMHC intentionally retaliated against Dr. Pianka with malice or with reckless indifference to Dr. Pianka's statutorily protected rights.

## COUNT VI
### ADA – Retaliation in violation of 42 U.S.C. § 12203(a)

158.    The allegations set forth in Paragraphs 1 through 157 are realleged and incorporated by reference.

159.    Dr. Pianka opposed CMHC's unlawful discrimination in providing public accommodations on the basis of disability in violation of 42 U.S.C. § 12182 when she reported discriminatory practices against CMHC's pediatric patients to senior leadership.

160.    CMHC retaliated against Dr. Pianka in violation of 42 U.S.C. § 12203(a) when it terminated her employment because she opposed CMHC's unlawful practices.

161.    As a direct and proximate result of this unlawful retaliation and in disregard of Dr. Pianka's rights, Dr. Pianka experienced lost wages, lost benefits, loss of enjoyment of life, loss of self-esteem, injury to reputation, injury to career, anxiety, humiliation, and other pecuniary and non-pecuniary losses.

162.    CMHC intentionally retaliated against Dr. Pianka with malice or with reckless indifference to Dr. Pianka's statutorily protected rights.

## COUNT VII
### MWPA—Retaliation in violation of 26 M.R.S. § 833(1)(B)

163.    The allegations set forth in Paragraphs 1 through 162 are realleged and incorporated by reference.

164.    Dr. Pianka engaged in protected conduct under the MWPA when she made good faith reports to CMHC that she reasonably believed conditions and practices at CMHC would put at risk the health and safety of CM Peds patients.

165.    CMHC unlawfully discharged Dr. Pianka because she engaged in the above-described protected conduct in violation of the MWPA.

166.    As a direct and proximate result of these unlawful employment practices and in disregard of Dr. Pianka's rights, Dr. Pianka experienced lost wages, lost benefits, loss of enjoyment of life, loss of self-esteem, injury to reputation, injury to career, anxiety, humiliation, and other pecuniary and non-pecuniary losses.

167.    CMHC intentionally retaliated against Dr. Pianka with malice or with reckless indifference to Dr. Pianka's statutorily protected rights.

### PRAYER FOR RELIEF

Plaintiff Gretchen Pianka respectfully requests the Court grant the following relief:

A.  Enter judgment in Plaintiff's favor;

B.  Declare the conduct engaged in by Defendant to be in violation of her rights and declare that Plaintiff is the prevailing party in this action;

C.  Award Plaintiff back pay for lost wages and benefits;

D.  Award Plaintiff compensatory damages;

E.  Award Plaintiff punitive damages;

F.  Award Plaintiff nominal damages;

G.  Order Defendant to reinstate Plaintiff or award lost future earnings to compensate her for the diminution in expected earnings caused by Defendant's discrimination;

H.  Award Plaintiff reasonable attorneys' fees, including legal expenses and costs;

I.  Award Plaintiff pre-judgment interest;

J.  Require Defendant to mail a letter to all employees notifying them of the verdict against it and stating that Defendant will not tolerate discrimination or retaliation in the future;

K.  Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order;

L.  Require that Defendant train all management level employees on the protections afforded by state and federal fair employment laws;

M.  Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant unlawfully terminated her; and

N.  Grant Plaintiff such other and further relief as may be just and proper.

Respectfully Submitted:

DATED:    February 13, 2026    /s/ Maria C. Fox_____

Maria Fox, Esq.
Justin S. Clark, Esq.
Meredith K. Cook, Esq.
Murray Plumb & Murray

75 Pearl Street
P.O. Box 9785
Portland, ME 04104-5085
(207) 773-5651
mfox@mpmlaw.com
jclark@mpmlaw.com
mcook@mpmlaw.com
Attorneys for Plaintiff